Nos. 22-5104/22-5125

IN THE UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

S.C.

     Plaintiff-Appellee/Cross-Appellant,

v.

METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON CO. TENNESSEE D/B/A METROPOLITAN NASHVILLE PUBLIC SCHOOLS

     Defendant-Appellant/Cross-Appellee.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
_____

**SECOND BRIEF**

**Appellee/Cross-Appellant S.C.**

Stephen Crofford
Mary A. Parker
**PARKER & CROFFORD**
5115 Maryland Way
Brentwood, TN 37027
(615) 244-2445 phone
(615) 255-6037 facsimile
stephencrofford@msn.com
mparker@parker-crofford.com

*Attorneys for S.C.*

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

## DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST

Sixth Circuit Case Numbers: 22-5104/22-5125

Case Name: S.C. v. Metro Nashville et al

Name of counsel: Stephen Crofford and Mary A. Parker

Pursuant to 6th Cir. R. 26.1, S.C. makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation?

NO

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial

interest in the outcome?   NO

CERTIFICATE OF SERVICE I certify that on December 5, 2022 the foregoing
document was served on all parties or their counsel of record through the CM/ECF
system as registered users.

s/ Stephen Crofford

# TABLE OF CONTENTS

**CORPORATE DISCLOSURE** ………………….…….……... **ii**

**TABLE OF CONTENTS** …………………………….……….. **iii**

**TABLE OF AUTHORITIES** ………………………….......... **v**

**STATEMENT IN SUPPORT OF ORAL ARGUMENT** ………….. **1**

**STATEMENT OF JURISDICTION** …………………………. **1**

**STATEMENT OF ISSUES** ……………………………….......... **2**

**STATEMENT OF THE CASE** ………………………………... **3**

    **A. FACTS RELEVANT TO THE JUDGMENT AWARDED** ... **4**

    **B. FACTS RELATING VACATING SUMMARY JUDGMENT**.. **10**

      **1. Role of the MNPS Title IX Coordinator** …………………. **10**

      **2. The Training Provided for MNPS Employees** ……..……... **13**

      **3. Mishandling of Jane Doe #2, Sally Doe #2 and S.C. Due**

        **to Training** ……………………………………………… **17**

         **a)  Jane Doe # 2 From Maplewood High School** ……..… **17**
         **b)  Sally Doe # 2 from Hunters Lane High School**…........ **23**
         **c)  S.C. from Hunters Lane High School**  ……………… **26**

    **C. FACTS SUPPORTING S.C.'S AWARDED DAMAGES**….. **31**

**SUMMARY OF THE ARGUMENT** …………………………….. **33**

**STANDARD OF REVIEW** ……….…….….……………………. **34**

**ARGUMENT** ……………………………………….……………... **35**

    **A. RESPONSE TO APPEAL OF MNPS**…………………….... **35**

      **1. THE TRIAL COURT CORRECTLY FOUND MNPS**

        **LIABLE UNDER TITLE IX**…………………………….. **35**

**2. MNPS CANNOT RAISE AN ISSUE ON APPEAL THAT IT FAILED TO RAISE IN THE TRIAL COURT**………………    **40**

**B. CROSS-APPEAL OF S.C**………………………………………..    **45**

**1. S.C.'s BEFORE CLAIMS SHOULD BE VACATED AND REMANDED** ………………………………………………..    **45**

**2. S.C.'s AFTER CLAIM DISMISSED ON SUMMARY JUDGMENT SHOULD BE VACATED AND REMANDED**….    **46**

**3. THE TRIAL COURT IMPROPERLY DISMISSED S.C.'S §1983 BEFORE CLAIM**…………………………………………..    **47**

**CONCLUSION** ……………………………………………….........    **49**

**CERTIFICATE OF COMPLIANCE** ……………………….…........    **50**

**CERTIFICATE OF SERVICE** ……………………………….……...    **50**

**ADDENDUM** …………………………………………………....……    **51**

iv

# TABLE OF AUTHORITIES

**Cases**

*ACT, Inc. v. Worldwide Interactive Network, INC.,*
46 F.4th 489 (6th Cir. 2022) .................................................... 42

*Asfall v. Los Angeles Unified Sch. Dist., No. 20-55599,*
2022 WL 2764747 (9th Cir. July 15, 2022) ……..................... 41

*Chesnut v. United States,*
15 F.4th 436 (6th Cir. 2021) …………………………….... 34

*Cummings v. Premier Rehab Keller,* P.L.L.C.
142 S. Ct. 1562 (2022) ............................................................. 41, 43

*Doe ex. rel. Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty.,*
35 F.4th 459 (6th Cir. 2022) .......... 2, 3, 4, 7, 10, 27, 33, 45, 46, 47, 48

*Doe v. Purdue Univ.,*
*No. 18-CV-89-JEM,* 2022 WL 2828238, at *4 (N.D. Ind. July 20, 2022) ........................................................................................ 44

*Fed. Home Loan Mortg. Corp.* v. *Lamar,*
503 F.3d 504 (6th Cir. 2007) .................................................... 34

*Foster v. Bd. of Regents of Univ. of Michigan,*
982 F.3d 960 (6th Cir. 2020) .................................................... 9, 39

*GenCorp, Inc., v Olin Corp.,*
477 F.3d 368 (6th Cir. 2007) .................................................... 42, 43

*Kollaritsch v. MI State Univ. Bd.,*
944 F.3d 613 (6th Cir. 2019) ............. 2, 3, 7, 10, 33, 35, 37, 45, 46, 47

*Mains v. United States,*
508 F.2d 1251 (6th Cir. 1975) .................................................. 38

*Sheet Metal Workers' Health & Welfare Fund of N. Carolina v. L. Off.*
    *Of Michael A. DeMayo, LLP*,
        21 F.4th 350 (6th Cir. 2021) ........................................................    40

*Varlesi v. Wayne State Univ*.,
        643 Fed. Appx. 507 (6th Cir.2016) .............................................    42

**Statutes**

42 U.S.C. § 1983 ................................................  2, 10, 36, 44, 46, 47, 48, 49

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Appellees Cross-Appellants request oral argument, pursuant to 6 Cir. R. 34, as they believe it could significantly aid the decisional process in this case. The purpose of the oral argument request is to emphasize and clarify the argument in the briefs, particularly in light of the evolving case law surrounding Title IX and the fact intensive nature of this analysis.

## STATEMENT OF JURISDICTION

S.C. agrees with and adopts the jurisdictional statement of MNPS and would supplement the jurisdictional statement to show that MNPS filed their notice of appeal on 2/9/22 (RE 187, Page ID #5205-5306). S.C. filed her cross-appeal on 2/17/22 (RE 197, Page ID #5371-5372). S.C.'s cross-appeal was timely filed within 14 days as required by FRAP 4(a)(3). This Court has jurisdiction to hear both the appeal of MNPS and the cross-appeal of S.C.

## STATEMENT OF ISSUES

### RESPONSE TO STATEMENT OF THE ISSUES OF APPELLANT, MNPS

1. **THE TRIAL COURT CORRECTLY FOUND MNPS LIABLE UNDER TITLE IX FOR ITS DELIBERATE INDIFFERENCE TO THREATS TO S.C. AND HER FAMILY FOLLOWING THEIR COOPERATION IN THE INVESTIGATION OF S.C.'S SEXUAL ASSAULT/SEXUAL HARASSMENT CLAIMS AT HER SCHOOL, THREATS OF WHICH DROVE S.C. FROM HER HIGH SCHOOL.**

2. **MNPS FAILED TO OBJECT TO CONSIDERATION OF EMOTIONAL DAMAGES IN A TITLE IX CASE BEFORE THE TRIAL COURT AND THEREFORE, MNPS BY FORFEITURE, CANNOT RAISE THE ISSUE ON APPEAL.**

### STATEMENT OF THE ISSUES OF CROSS-APPELLANT, S.C.

3. **WHETHER THE TRIAL COURT INCORRECTLY APPLIED *KOLLARITSCH* ON RECONSIDERATION OF SUMMARY JUDGMENT AND DISMISSED PLAINTIFF'S TITLE IX AND 42 U.S.C. §1983 "BEFORE CLAIMS" AND SOME OF PLAINTIFF'S TITLE IX "AFTER CLAIMS" IN LIGHT OF THE SIXTH CIRCUIT HOLDING IN DOE EX. REL. DOE #2 V. MNPS OPINION[1].**

---

[1] *Doe ex. rel. Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty.*, 35 F.4th 459 (6th Cir. 2022).

2

## STATEMENT OF THE CASE

This case is one of four consolidated cases against MNPS, all of which involve an unauthorized recording of unwelcome sexual conduct against plaintiffs and the unauthorized release of those recordings to other students and the public. The four cases all occurred during the same school year and were consolidated under the S.C. case docket number as the lead case. MNPS moved for summary judgment on all four cases and the Trial Court denied summary judgment as to all cases. (Memorandum on summary judgment, RE 101, Page ID #4106-4163). In light of the then pending interlocutory appeal of *Kollaritsch,* the Trial Court granted an interlocutory appeal in the four consolidated cases against MNPS. The Sixth Circuit panel then decided *Kollaritsch v. Michigan State University*, 944 F.3d 613 (6th Cir. 2019), and, thereafter, remanded the four consolidated cases for reconsideration based upon *Kollaritsch.*

Upon reconsideration of the summary judgment motion, the Trial Court dismissed two cases and allowed two cases to move forward, limiting the theories of recovery available. (Memorandum on reconsideration of summary judgment, RE 124, Page ID ## 4334-4375). Of the two cases that moved forward, one case reached a settlement and S.C.'s case was tried on a narrow portion of her "after claims". The two dismissed cases were appealed. In a reported decision, the Sixth Circuit reversed and remanded the two appealed cases in *Doe ex. rel. Doe #2 v.*

3

*Metro. Gov't of Nashville & Davidson Cnty.*, 35 F.4th 459 (6th Cir. 2022). The S.C.

memorandum opinion from trial was filed on January 22, 2022 (Findings of Fact &

Concl. of Law, RE 182, Page ID #5134), predating the release of the *Doe ex. rel.*

*Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty.* opinion on May 19, 2022.

As set forth in the jurisdictional statement, MNPS timely filed an appeal of the

bench trial and S.C. timely filed her cross-appeal.

**A.**
**FACTS RELEVANT TO THE JUDGMENT AWARDED TO S.C. FOR THE**
**ONGOING THREATS AFTER MNPS WAS MADE AWARE OF THE**
**THREATS AGAINST S.C.**

S.C. testified to unwelcomed oral and vaginal sexual conduct she was

subjected to by her male student assailant, J.J., during her lunch hour at Hunters

Lane High School. Her testimony included being pushed to her knees and J.J.

pulling her head toward his genitalia for oral sex. S.C. further testified that the

assailant pulled her into a room where he subjected her to more unwelcomed oral

sex and painful and unwelcomed vaginal sex. S.C. testified she told her assailant to

stop but was told to shut the f_ _ _ up. (S.C.'s Trial Testimony, Tr., RE 166, Page

ID ##4580-4581, 4582, 4584-4585.) S.C. testified the sex was painful, not only

because she was a virgin but because the assailant pulled her hair and smacked her

throughout the sex acts. She testified that nothing about the sexual activity was

pleasurable. (S.C.'s Trial Testimony, Tr., RE 166, Page ID #5155.)

During the unwelcomed sexual conduct, another female student, S.D.,
entered the room and filmed a portion of the encounter without S.C's consent.
Additionally, the video was released to students at S.C.'s school and the public at
large without her consent. S.D. told S.C. the video was released and that everyone
in the school had it. (S.C.'s Trial Testimony, Tr., RE 166, Page ID ##4586-4587,
4613.) The Trial Court found S.C.'s trial testimony credible regarding her
interactions with J.J. and S.D. (Findings of Fact & Concl. Of Law, RE 182, Page ID
#5157.)

The morning after the sexual events, S.C. and her mother, T.C., went to the
school to meet with school administration and S.C. filled out a statement. Among
other things, the written statement indicated that S.C. wanted the sexual activity and
the recording of it to stop. The statement is quoted in the Trial Court's ruling.
(Findings of Fact & Concl. Of Law, RE 182, Page ID #5162.)( Statement from S.C.
Defendants Trial Ex. 2 Principles investigative file, App. At 54.) A Detective
Carrigan questioned S.C., treating her as a criminal suspect throughout the
interview, rather than a potential rape victim. the Detective recorded the
conversation and a copy of the recording via memory stick, (Plaintiff's Exh. 42(p))
and a transcription of the recording, Plaintiff's Exh. 42(t) App. At 392-421. Were
presented to the Trial Court. (Findings of Fact & Concl. of Law, RE 182, Page ID
#5162.) The Trial Court confirmed hearing S.C. telling the Detective that she was

being threatened for cooperating in the investigation. S.C. told the Detective that the threats included S.C. being shot and S.C. provided the name of at least one participant to the Detective. The Detective shifted the conversation and informed S.C that if anyone was prosecuted, he would also have to prosecute S.C. for participating in the creation of child pornography. (Findings of Fact & Concl. Of Law, RE 182, Page ID ##5162-5163.)(citing the transcript of recorded conversation, Plaintiff's exhibit 42(t) at pages 2-10, 13.)(App. At 393-401, 404).

During the same conversation, Principal Kessler, in concern for her own reputation, came into the room and whispered to Detective Carrigan "Please, I cannot have this be a rape, okay? It's not a rape." The Trial Court factually found and cited Kessler's comment that was in the recording, Plaintiff's exhibit 42(p), and stated in footnote 10, that she listened to the recording on good speakers and could clearly hear that exchange. (Findings of Fact & Concl. Of Law, RE 182, Page ID #5164, fn. 10.) Of note, the provided transcript noted that comment as "inaudible" and therefore, the audio was played during the trial.

S.C. and T.C. went directly from their recorded conversation with Detective Carrigan into a meeting with Principal Kessler. T.C. testified that during the meeting, they informed Principal Kessler about the ongoing threats from other students and provided her with a list of involved students. S.C. and T.C. further testified that they told the principal that S.C.'s sister was just outside in the car with

a phone containing the incoming threats. They asked the principal if she wanted to look at the phone and the principal declined. (T.C.'s Trial Testimony, Tr., DE 166, Page ID ##4524-4530.) Principal Kessler denied this conversation but the Trial Court, as the finder of fact, found S.C and T.C. to be credible regarding that conversation (Findings of Fact & Concl. Of Law, RE 182, Page ID #5170.)

Additionally, T.C. testified that she informed Assistant Principal Newman several days later that the threats from students were ongoing but the principal rebuffed her and told her to take it up with the Detective. Principal Newman denied this, but the Trial Court, as the finder of fact, found T.C. more credible. (T.C.'s Trial Testimony, Tr., RE 166, Page ID ##4543-4544, 4555.) (Findings of Fact & Concl. Of Law, RE 182, Page ID #5171.)

Without the benefit of the 6th Circuit holding in *Doe ex. Rel. Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty,* the Trial Court relied upon *Kollaritsch* to make important factual findings relevant to the sole issue upon which she found liability. Liability resulted only from the ongoing harassing threats to S.C. during and after her meeting with school officials about the sexual assault, unauthorized filming, and release of the unauthorized recording. The trial court held MNPS liable only for the "after claim", focusing on "the actual post-incident harassment that [S.C.] endured rather than broader aspects of the school's alleged mishandling of her case." She further held that "a female student's being hounded out of school by

7

threats and harassment related to her participation in a school's investigation into an

on-campus sexual event is well within the core Title IX issues that survive

*Kollaritsch*." (Findings of Fact & Concl. Of Law, RE 182, Page ID #5182).

The Trial Court found that S.C. told the executive principal she was being

threatened because of her cooperation in the sexual harassment investigation, and

specifically held as follows:

1. S.C. and her family received violent threats during the period in which she was enrolled in MNPS, which included the suggestion that someone would *kill S.C.'s mother,* and the threats were, at times, expressly tied to the possibility of S.C. facing reprisal if she returned to school in person;
2. the threats had the objective purpose of discouraging S.C. from seeking the school's assistance in combating gender-oriented harassment;
3. the threats were sufficiently severe and pervasive to count as "actionable" instances of harassment;
4. the threats had a strong connection to the school environment itself;
5. harassment intended to keep a student out of school and, in effect, create a barrier between the student and the education to which she is entitled is about as school-related as harassment can get; and
6. in summary, the court held that "S.C., therefore, has established the required elements of an initial incident, actual notice to the school, and additional post-notice incidents of actionable harassment with a nexus to the school environment." (Findings of Fact & Concl. Of Law, RE 182, Page ID #5187).

The Trial Court further found that based on the evidence at trial, the threats

did occur and were communicated to school administrators while S.C. was a

student. MNPS subsequently failed to take steps to prevent the ongoing harassment.

Principal Kessler even testified that "if anyone had told me there were threats or harassing comments at that time, I would have done something about it" (Kessler's Trial Testimony Tr., RE 166, Vol. I, Page ID #4730). The obvious conclusion from the facts as determined by the Trial Court, were that Kessler (1) knew about threats; (2) knew she should have done something; and (3) chose to ignore them and do nothing, constituting deliberate indifference by MNPS. The threats and harassment resulted in the denial of S.C.'s equal educational opportunity due to her sex. (Findings of Fact & Concl. Of Law, RE 182, Page ID ##5190-5191). Based on these facts, the Trial Court cited *Foster v. Bd. Of Regents of Univ. of Michigan* 982 F.3d 960, 965 ( 6th Cir. 2020), and held that doing almost nothing to known harassment amounts to deliberate indifference. (Findings of Fact & Concl. Of Law, RE 182, Page ID #5188).

The factual findings included the Trial Court's finding that the threats kept her from school when she was still a student. "The court finds, however, that at least some of the threats (1) occurred while S.C. was enrolled at Hunters Lane and (2) were expressly connected to Hunters Lane, the school's investigation, whether S.C. would cooperate in that investigation, and/or whether S.C. would return to Hunters Lane as an in-person student." (Findings of Fact & Concl. Of Law, RE 182, Page ID #5173).

**B.**

**FACTS RELATING TO SUMMARY JUDGMENT RULING THAT
INCORRECTLY APPLIED *KOLLARITSCH* AND DISMISSED
PLAINTIFF'S TITLE IX AND 42 U.S.C. § 1983 BEFORE CLAIMS
AND DISMISSED SOME OF PLAINTIFF'S TITLE IX AFTER CLAIMS**

As described previously, the S.C. and Mary Doe cases were consolidated

with the Jane Doe and Sally Doe cases for the reconsidered summary judgment

ruling (Memorandum, RE 124, Page ID ##4333-4375) entered after *Kollaritsch*.

The facts set forth herein mirror those in the appeal of Jane and Sally Doe in *Doe*

*ex. rel. Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty.*

**1. Role of the MNPS Title IX Coordinator.**

The applicable guidelines for Title IX Coordinators to the case before the

Court, were outlined in an April 24, 2015 "Dear Colleague Letter" issued by the

U.S. Department of Education. Memo, RE 1-1. In that letter, a Title IX funding

recipient "must inform the Title IX coordinator of all reports and complaints

raising Title IX issues, even if the complaint was initially filed with another

individual or office or the investigation will be conducted by another individual

or office." *Id.*

Julie McCargar ("McCargar") was the Title IX coordinator for MNPS from

2012 through the 2016-2017 school year. (McCargar Dep., RE 92-25, Page ID ##

3958, 3960.) While McCargar was required to read the aforementioned "Dear

Colleague Letters" she doubted that MNPS principals would have read the Dear

10

Colleague Letters. *Id.* at Page ID ## 3965-3966. The record shows that McCargar did not tell the principals to contact her if they were involved with a potential Title IX situation because she usually interacted with the principals' supervisors. *Id.* at Page ID # 3968. Significantly, she failed to request that the principals' supervisors tell the principals that they should contact her, as the Title IX coordinator, if they observed a situation that could be a Title IX violation. *Id.* at Page ID ## 3968-3969. Her justification for that failure was that it was not what the policy stated. The policy only requires the principal to investigate at the school level. *Id.* McCargar was not aware of what the principals did or did not do to determine whether there was a Title IX violation. *Id.* at Page ID ## 3971-3972.

During the aforementioned time period, McCargar never received any training on being a Title IX Coordinator. *Id.* at Page ID # 3559. Likewise, McCargar was unaware of any training given to principals and assistant principals on how to conduct a Title IX investigation prior to the McGrath training, allegedly rolled out in the 2016-2017 school year. *Id.* at Page ID # 3963-3964. Despite their lack of training, McCargar testified that MNPS principals were allowed to conduct Title IX investigations. *Id.* at Page ID ## 3966-3967. The record also confirmed that during the entirety of the investigation, the principals have no obligation to tell the Title IX coordinator they were reviewing a potential Title IX violation. *Id.* at Page ID ## 3968-3969.

11

Notwithstanding the fact that she was the Title IX coordinator, McCargar did not have anything to do with gathering the numbers pertaining to sexual bullying or harassment, and took no responsibility for the compliance report sent to the State of Tennessee. *Id.* at Page ID ## 3961-3962. Instead, she delegated that responsibility to Phyllis Dyer ("Dyer"), the Compliance Coordinator for Federal Programs. *Id.*

Dyer, the current Title IX coordinator, testified that the principals did not receive any training until after the new policy was implemented in May of 2016. (Dyer Dep., RE 92-18, Page ID ## 385-3847.) While Dyer worked with the Metro legal department to implement the Title IX policy at MNPS in May of 2016, prior to May 2016, she is unaware of what Title IX training had occurred, if any. *Id.* at Page ID ## 3843-3844. Dyer acknowledged that the duties of the Title IX coordinator are rolled into the duties of the executive director of federal programs.[2] Dyer acknowledged that weeks could go by where she did not have any duties as a Title IX coordinator and almost 100% of her time would be spent on her job duties related to the $81 million in funds. Id. at Page ID ## 3839-3840. Dyer acknowledged that the determination on whether there is a Title IX violation is left

---

[2] The primary responsibility of the executive director for federal programs is to assure that approximately $81 million in federal funds get appropriated to the MNPS budget. Dyer acknowledges that she spends most of her time making sure this money gets into the Metro budget.  Dyer Depo., RE 92-18, Page ID ## 3836-3838.

to the sole discretion of the principal or principal's designee. *Id.* at Page ID ## 3851-3852. The Title IX coordinator is only notified if the principal determines that there was an actual Title IX violation. *Id.* at Page ID ## 3841-3842.

## 2. The Training Provided for MNPS Employees.

The evidence confirms that most of those in authority at MNPS were not aware of the subject cases of sexual misconduct, nor were they aware of the history of such behavior in the district. First, and most importantly, based on an apparent lack of policy and procedure, McCargar did not oversee any investigation involving the four consolidated cases including S.C., Mary Doe, Jane Doe # 2 or Sally Doe # 2. S.C. and Sally Doe attended Hunters Lane High School while Mary Doe and Jane Doe attended Maplewood High School. McCargar had no idea that these students had complained to their respective principals; and she did not know how many students in MNPS had their cases similarly dismissed or rejected by school principals, all because none of it was brought to her attention. (McCargar Dep., RE 92-25, Page ID ## 3984-3985.)

McCargar was further unaware that SRO Boone, from S.C.'s school, Hunters Lane, testified that there were approximately 5 to 10 cases of sexual videos that had occurred at Hunters Lane alone, and that he was aware of, maybe 12 incidents at Hunters Lane involving sexting of naked or half naked girls. *Id.* Boone further

testified he notified the administration of Hunters Lane of these incidents. (Boone Depo., RE 83-5, Page ID ## 2600-2601.)

Detective Robert Carrigan, who works with sex crimes for the Metro Nashville Police Department, testified that sexual videos and sexting have occurred in every school in the school district. (Carrigan Dep., RE 92-15, Page ID ## 3799-3804.)

When the facts of the Sally Doe case were discussed with Dyer at her deposition, she was unaware of how many similar incidents had occurred in MNPS schools of which she was uninformed. Dyer testified that she was never notified of any of the consolidated cases. (Dyer Depo., RE 92-18, Page ID ## 3874-3877.)

While Shawn Joseph, Ph.D., director of schools for MNPS ("Dr. Joseph") (Joseph Dep., RE 92-20, Page ID ## 3884-3885) was made aware, after the fact, that the assistant principal at Hunters Lane failed to notify the executive principal about the sexual activity and recording in the Sally Doe case, he was unaware that the same thing happened at Maplewood, where the assistant principal was aware of a sex tape and sexual activity at the school and similarly failed to notify the executive principal. *Id.* at Page ID ## 3891-3893.

Principal Newman from Hunters Lane testified that she did not even know if there was a Title IX coordinator anywhere in the MNPS system, whether at the

school or downtown. At Hunters Lane, Newman only received on-the-job training or "learning as you go" for dealing with potential Title IX violations. Upon joining the staff at Hunters Lane, Newman did not recall any information brought to her attention through Principal Kessler or elsewhere pertaining to what she was supposed to do about potential Title IX violations. Immediately prior to Hunters Lane, she had been a teacher at Whites Creek and, prior to that at Antioch, and received no information or training previously at either MNPS school on how to deal with a Title IX violation. No employee of a MNPS school has ever educated her about what a teacher should do if they became aware of a Title IX violation. Other than the parent student handbook, she is not aware of any information given to the students or parents at Hunters Lane about Title IX. She does not know whether the handbook explains what Title IX is and she does not recall ever telling the students or parents at Hunters Lane what Title IX addresses. (Newman Depo. RE 92-26, Page ID ## 3994-3998, 3999, 4000-4001.) No one trained her about how to conduct a Title IX investigation at any of the Metro schools where she worked. (Newman Depo. RE 92-26, Page ID ## 4002-4003.) Kessler never addressed any forms with her that should be filled out in a bullying or harassment situation. (Newman Depo. RE 92-26, Page ID ## 4004-4005.)

Other assistant principals were likewise not adequately trained. Principal Long from Maplewood testified he had been at Maplewood for 18 years, the last 3

of which as an assistant principal, and during that entire time, he had never seen a Title IX coordinator come to Maplewood to speak with the students and/or teachers about Title IX. (Long Depo. RE 92-22, Page ID ## 3928, 3934-3935.) Long believed he should use the district disciplinary manual from the student parent handbook to deal with Title IX. (Long Depo. RE 92-22, Page ID ## 3929-3931.) The executive principal did not give Long the handbook as information on how to handle Title IX cases, nor did she give him any other documents or instructions regarding how to handle Title IX potential issues. (Long Depo. RE 92-22, Page ID ## 3932-3933.)

Ms. Hall, the Dean of students from Maplewood testified she has never referred a person to the Title IX coordinator, nor had anyone ever told her when to report a person to the Title IX coordinator. She did not know if she had ever met the Title IX coordinator and was not sure who the Title IX coordinator was. She further testified that the school does not give a Title IX presentation to the students. (Hall Depo. RE 92-19, Page ID ## 3881-3882.)

Principal Young, from Hunters Lane, said executive Principal Kessler did not give him any specific training regarding Title IX. (Young Depo. RE 92-32, Page ID # 4053.) He had never seen the bullying and harassment intake form utilized at Hunters Lane. He had no memory of anyone telling him where those forms were located at Hunters Lane. He did not remember Kessler telling him, if there's an

incident regarding sexual harassment, cyber bullying, or a Title IX issue, this is the form to use. (Young Depo. RE 92-32, Page ID ## 4054-4058.) While at Hunters Lane, Young never referred a student to the Title IX coordinator. Kessler never told him if there's an incident that might be a violation of Title IX that it was his obligation to notify the Title IX coordinator. He further was not told by Kessler that if a situation involved Title IX violation that he should notify the parent that they should contact the Title IX coordinator. (Young Depo. RE 92-32, Page ID ## 4058-4059.)

### 3. Mishandling of Jane Doe #2, Sally Doe #2 and S.C. Due to Training

The failure to train, along with the policy of delegating the Title IX responsibilities to the untrained, impacted all four consolidated cases, and demonstrates that the lack of training was throughout MNPS. Mary Doe, the settled case, and the Jane Doe #2 case took place contemporaneously with the same video at Maplewood High School. Their unwelcome sexual actions and recording was the first in time, of the consolidated cases, taking place in the fall of 2015. Sally Doe's case happened in the early part of 2016 at Hunters Lane. S.C.'s violations were the last of the four violations to occur.

### 3.a). Jane Doe # 2 From Maplewood High School

On or about September 21, 2016, Jane Doe #2, a then 14-year-old freshman, along with another female freshman, were involved in unwelcome sexual conduct with four upper-class male students in a stairway at Maplewood High School ("Maplewood"). (Affidavit of Jane Doe # 2, RE 95, Page ID # 4076.) This incident was recorded and subsequently released to other students and the general public. *Id.*

On October 12, 2016, Jane Doe #2 and her parents met with Student Resource Officer Earnest Fields and Detective Michael Passaro along with Assistant Principal Dr. Marvin Olige , and told them of the sexual activity involving Jane Doe #2 and the male students in a stairway at Maplewood High School and that this activity was recorded. (Defendants' Interrogatory Responses, RE 87-15, Response # 4 Page ID # 3220; Olige Dep., RE 77-1, Page ID ## 1686-1687.)

It is important to highlight that, not only did Dr. Olige not take any notes during the aforesaid meeting, but the statements written by Jane Doe #2 and another witness regarding the incident were shredded by Maplewood personnel. (Olige Dep., RE 77-1, Page ID ## 1687, 1689-1690.) Dr. Olige testified that even though he involved Detective Passaro, he did not ask him who was involved in the sexual activity or the recording. *Id.* at Page ID ## 1696-1698. Also, during the meeting, out of concern for their daughter's sexual activity, Jane Doe #2's parents advised Dr. Olige that they were transferring their daughter out of Maplewood that day. *Id.*

at Page ID # 1699. Dr. Olige failed to reassure the family that their daughter would be safe if she stayed at Maplewood, nor did he take any affirmative steps to reconcile the situation. *Id.* at Page ID #3 1670-1671. Dr. Olige further neglected to advise Maplewood's executive principal about the sexual activity and recording until after the lawsuit was filed. *Id.* at Page ID #1701. Dr. Olige testified that he was unsure why he did not tell the executive principal about this incident. *Id.* The record also confirms that Dr. Olige did not refer Jane Doe #2, or her parents to the Title IX coordinator or the executive principal, even though he knew they were forced to remove their child from Maplewood. *Id.* at Page ID ##1738-1739.

As part of his duties, Detective Passaro would notify some member of the administration – including a principal or assistant principal – at Maplewood, if kids were engaging in sexual activity at school. (Passaro Dep., RE 77-5, Page ID ## 1845-1846.) Detective Passaro testified that once he notified a member of the administration, then as far as he was concerned, he had "done [his] due diligence with notifying the school." *Id.* at Page ID # 1847-1849. Detective Passaro further testified that, while he could not recall the specifics of who was present during the aforesaid meeting, if Olige was present and knew of the incident, he did not need to notify any other principal. *Id.* at Page ID ## 1859-1860. The record indicates that the individuals which were involved in the recording depicting the sexual incident included Jane Doe #2, another female and four boys, which information Detective

19

Passaro obtained and subsequently recorded from the meeting with Jane Doe #2 and her family. *Id.* at Page ID ## 1860-1862.

The record reflects that Executive Principal Dr. Keely Mason ("Dr. Mason") of Maplewood was not informed that Jane Doe #2 and her parents came to the school to inform the administration about the sexual encounter and accompanying video. (Mason Dep., RE 87-11, Page ID ## 3162-3163.) Indeed, Dr. Mason testified that she did not learn that Dr. Olige knew of the sexual activity and recording until her deposition, which took place on November 28, 2018. *Id.* at Page ID ##3164-3165. Dr. Mason testified that she feels as if she should have been notified of the sexual encounter which occurred in the school stairway. *Id.* at Page ID # 3164.

Dr. Mason acknowledged that if an incident, such as cyber sexual bullying, sexual harassment, or inappropriate sexual behavior occurs in school, specific steps and forms are to be utilized. *Id.* at Page ID ## 3165-3166; *see also* Bullying and Harassment Reporting Form, RE 70-17, Page ID # 672. In normal course, the "intake form" is reviewed with the "alleged victim and other witnesses or adults that may be aware of something . . . ." Mason Dep., RE 87-11, Page ID # 3165. The record indicates that had Dr. Mason been informed of the sexual activity and video which took place with respect to Jane Doe # 2, this form would have been filled out. *Id.* at Page ID # 3166. Dr. Mason further testified that following initial intake of an incident involving potential cyber sexual bullying, sexual harassment,

20

or inappropriate sexual behavior, policies and procedures require her to commence an investigation to determine whether a Title IX violation occurred. *Id.* at Page ID ## 3167-3168.

The record reflects that Dr. Mason was not aware of any school-level investigation into the complaints of Jane Doe #2 at Maplewood, nor was she aware of any investigation by any downtown administrators, including the Title IX coordinator. *Id.* at Page ID ## 3169-3170. Dr. Mason testified that if Jane Doe #2 filled out a written statement that should have been in her file, which would have been housed in the freshman academy. *Id.* at Page ID ## 3172-3174.

While Dr. Mason was aware of the school district's obligation to report incidents involving sexual cyber bullying and sexual harassment to the Tennessee Department of Education ("DOE"), she did not notify anyone about this incident because no one told her about it. *Id.* at Page ID # 3176. While the record is replete with evidence that other administration officials from Maplewood were aware of the subject incident and resulting recording, Dr. Mason was not aware of anyone else from Maplewood who notified the DOE. *Id.* at Page ID ## 3176-3177. Prior to the subject lawsuit, Dr. Mason testified that she was not aware of any incidents involving sexual conduct at Maplewood. *Id.* at Page ID ## 3177-3178. To be sure, the record reflects that Dr. Mason was unaware that there had been over 3500 incidents of sex harassment, sexual inappropriate touching, or sexual inappropriate

conduct, over the last five years within Metro schools.  *Id.* at Page ID ## 3178; *see also* (List of Incidents Disclosed, RE 70-15 Page ID # 632).

The record further shows that, despite being the Executive Principal at Maplewood, Dr. Mason was not involved in the decision as to what discipline was appropriate for the students involved in the sexual activity and recording involving Jane Doe # 2.  Instead, Dr. Mason learned, for the first time during her deposition, that "the administration at Maplewood decided to not punish the students involved including [Jane Doe #2] beyond verbal discipline.  The administration concluded the incident was an opportunity to impart some wisdom and life instruction. They did not wish to subject the students to potential humiliation and discipline them for consensual acts, part of which they believed was only kissing."  (Mason Dep, RE 87-11, Page ID ## 3181-3182); *see also* (MNPS response to S.C.'s interrogatories, RE 70-16, Response No. 22, Page ID # 664.)  Had Dr. Mason been involved in the disciplinary decision(s) and/or made aware that students had sex in the stairway, she testified that they "would have been put on a two-day summary suspension until after the full investigation, until we figured out what their involvement and whether they were or not, and then discipline consequences would have been given accordingly."  (Mason Dep., RE 87-11, Page ID # 3182.)  She acknowledged that if it was consensual sex, that this would have been inappropriate sexual conduct at school that called for punishment on the disciplinary grid. Conversely, she

acknowledged that if it was unwelcomed or coerced sexual activity, it would call for greater punishment. *Id.* She further acknowledged if there was a sexual recording made, that would also call for punishment ranging from severe disruption of school activity to sexual cyber bullying, to sexual harassment, to hazing and various other things that could arise. *Id.*

### 3.b). Sally Doe # 2 from Hunters Lane High School

On or about February 21, 2017, Sally Doe #2, a freshman at Hunters Lane High School ("Hunters Lane"), was pulled into the boy's restroom at school, forced into a stall and pressured to perform oral sex, all of which was unwelcome. (Affidavit of Sally Doe # 2, RE 92-6, Page ID # 3399.) The incident was recorded and later circulated at Hunters Lane and to the public, without Sally Doe # 2's consent or knowledge. *Id.*

On April 7, 2017, Sally Doe, the mother of Sally Doe #2, met with SRO James Boone and Assistant Principal for the Freshman Academy at Hunters Lane High School, Nicole Newman. (Affidavit of Sally Doe, RE 92-5, Page ID # 3394.) Sally Doe, along with Sally Doe #2, who was also brought into the meeting, reported to Newman and SRO Boone the existence of a recording depicting oral sex between Sally Doe #2 and a male student which occurred in the school bathroom. *Id.* SRO Boone testified that his understanding of the reason for the meeting was

that Sally Doe #2 had discovered that the incident was recorded, and that she was unaware, at the time of the incident, that it was being recorded.   (Boone Dep., RE 83-5, Page ID ## 2623-2624.) Newman was aware that Sally Doe was concerned that the recording was circulating but could not recall whether she asked Sally Doe who was circulating it, whether it was being circulated at school, or whether the circulation was interfering with Sally Doe #2's educational opportunities. (Newman Dep., RE 70-3, Page ID # 490.) Further, Newman could not recall whether she took any notes regarding the incident, whether she told the executive principal, Dr. Susan Kessler of the meeting or whether she did anything at all in response to Sally Doe's concerns.  *Id.* at 490-491.

Following Sally Doe and Sally Doe # 2 reporting the incident and the recording of it being circulated, Sally Doe # 2 began to receive threats and experience harassment.   (Affidavit of Sally Doe, RE 92-5, Page ID # 3394.)  On April 12, 2017, Sally Doe sent an email to Newman, updating her of the ongoing harassment of Sally Doe #2 as follows:

> "We decided to keep her out of school today after learning that she was being harassed at school every day. She has been keeping up the act that everything was going okay… However:
>
> 1.  Students are yelling and throwing things at her when she walks down the hallway. She says she had to keep her headphones in to try to drown them out.

2. (Male student involved in oral sex)(name removed) tried to fight her yesterday, in front of a large crowd then told her he was going to have someone ("Sally Doe #2" told me the girls name, but I don't remember) to beat her up

3. A student in one of her classes had the recording, and was talking to the teacher about it, and even offered to show the teacher, but the teacher refused!

There's absolutely no way I could send my child to this detrimental environment every day. I know it's close to the end of the year but we need to come up with an alternative until I can homeschool her next year.

Can her father come up there and gather her work (and make up work) for the remainder of the week. Are you a good contact person to give her alternative arrangements for her the remainder of this school year?"

(Sally Doe and Newman Correspondence, RE 70-14, Page ID # 630.)

The record reflects that Newman could not recall whether she notified Dr. Kessler of Sally Doe's email. (Newman Dep., RE 70-3, Page ID # 491.) Dr. Kessler testified that she was not aware of Newman's knowledge of the sexually explicit recording of Sally Doe #2, or the ongoing harassment she was experiencing, until this lawsuit was filed. (Kessler Dep., RE 70-5, Page ID ## 515, 518.) Dr. Kessler testified that Newman should have told her of the video involving Sally Doe #2, but she did not. *Id.* Page ID # 518. Dr. Kessler also testified that typically the SRO would alert her to any investigations involving sex videos at the school, but that in this case, she was not made aware of the incident involving Sally

25

Doe #2.  *Id.* Page ID ##516-518. Dr. Kessler acknowledged that the standard operating procedures for bullying and harassment were effective in May 2016, she testified that she did not receive any training regarding the policy until April 7, 2017.  (Kessler Dep., RE 92-21, Page ID # 3915.)

Sally Doe testified that she expected Newman to investigate the incidents of harassment described in her email and to take steps to prevent the activity from continuing.  (Sally Doe Dep., RE 83-3, Page ID # 2445.)  However, Newman did not tell Sally Doe of any action the school was taking or would take to prevent Sally Doe #2 from being beaten up, threatened, or ridiculed at school.  *Id.* at Page ID # 2445-2446.  Newman did not refer Sally Doe to any other administrator, such as Dr. Kessler or the Title IX coordinator; instead, Newman told Sally Doe that there was nothing the school could do about the harassment because it was a police matter. *Id.* at Page ID # 2446-2447. Sally Doe ultimately removed Sally Doe #2 from school for the remainder of the 2016-2017 school year because she was concerned for her daughter's well-being and because the school failed to inform her of measures taken to protect Sally Doe #2 from ongoing threats and harassment. (Affidavit of Sally Doe RE 92-5, Page ID # 3395.)

### S.C., Counter-Appellant herein, from Hunters Lane High School

While many of the facts from the Consolidated Summary Judgment Opposition, RE 92, Page ID #3313 were set out in the Sally/John Doe appeal (*Doe*

*ex. rel. Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty.)* and provided hereinabove, the facts regarding S.C., as set forth in the Memorandum on the reconsidered summary judgment, were not included in the prior appeal, and are set forth below.

Dr. Kessler from Hunters Lane High School was not trained on the policies and procedures for implementation of Title IX until April 2017, even though the policies were effective in May 2016. (Dyer Dep., RE 92-18, Page ID ##3873-3874.) It is clear that Kessler failed to follow any alleged training she may have received. Kessler testified that the S.C. incident was not sexual harassment, because S.C. allegedly told her that she consented to the sexual activity and Kessler believed, if consensual, it was not a violation of Title IX.  For that reason, Kessler did not use the standard operating procedures in the S.C. case. Kessler claimed that S.C. also allegedly consented to being recorded, although she subsequently testified that S.C. never consented to the recording being passed around Hunters Lane. (Kessler Dep., RE 92-21, Page ID ##3912-3914, 3916.) Kessler's justification for not treating this case as one of sexual harassment and failing to do a Title IX investigation, is factually unsupported.

The written witness statement of S.C. to the school on the day that the incident was reported to Kessler, stated, among other things, that S.C. wanted to stop both the boy having sex with her and the person that was recording. This

statement was filled out at the school and was available to Kessler as the executive principal. (Statement from S.C. RE. 74-1, Page ID #1184); (Kessler Dep., RE 92-21, Page ID #3917.)

Detective Carrigan from the Metro Police Department sex crimes division submitted a request for forensic services and noted in the request that S.C. felt pressured/coerced into having sex with the suspect. Carrigan Depo. (Carrigan Dep. RE. 92-15, Page ID #3816.) S.C., in her affidavit, confirmed that the sexual activity in question was unwelcome and that she also felt badgered and intimidated by the police interview.  S.C. testified that when Detective Carrigan talked to her, he told her that the sex was consensual because the boy did not hit her. (S.C. Aff. RE 92-11, Page Id #3424.) Her testimony is confirmed by the transcribed statement of the conversation of Carrigan with S.C. (Carrigan Dep. RE. 92-15, Page ID #3825.) Carrigan further told S.C. that if anyone was prosecuted, S.C. would also have to be prosecuted for child pornography, which scared her. (S.C. Aff. RE 92-11, Page Id #3424); (S.C. Dep., RE 92-31, Page ID ##4050-4051); (Carrigan Dep. RE. 92-15, Page ID ##3822-3823.) S.C. testified that the male student pushed her to the ground and made her perform oral sex. S.C. said she told the boy to stop the sexual intercourse, but he told her to shut up and she did not break away. (S.C. Dep., RE 92-31, Page ID ##4042, 4043-4044.)

There was certainly ample evidence that the sexual conduct was unwelcome and that the incident should have been investigated as a potential Title IX issue. However, Kessler had never, in her 10 years at Hunters Lane, ever referred a student to the Title IX Coordinator and summarily decided not to utilize any Title IX procedures in the S.C. case on her own. Instead, S.C. the victim of the severe harassment, along with J.J., the male student perpetrator., received identical three-day suspensions for "inappropriate sexual behavior." (Continuing Exs. 1, 6. RE 92-13, Page ID #3435, 3440.)  M.R., J.D., A.H., D.H., Q.C., all of whom participated in the dissemination of the sex recording, subsequently received three-day suspensions for "severe disruption of school activities." (Continuing Ex's. 2, 3, 4, 5, 10. RE 92-13, Page ID ## 3436, 3437, 3438, 3439, 3443.) S.D., the student who recorded the video received a three-day suspension for "severe disruption of school activities." (Continuing Ex. 9. RE 92-13, Page ID #3442.) In addition to the school suspending her, S.C. as set forth above, was misinformed by the police, that not being hit meant that the sex was consensual, and S.C. was threatened with prosecution for child pornography.

Dyer, Title IX coordinator, acknowledged that a discipline code for "severe disruption of school activities" would not notify her as the Title IX coordinator that it may involve sexual cyber bullying for sexual harassment. (Dyer Dep., RE 92-18, Page ID ##3859-3862.) Kessler testified she did not tell the kids at the school prior

to the S.C. case, that if they engaged in sexual conduct at school, they would be punished severely, because that would be a lie. In fact, engaging in sexual conduct under the school systems disciplinary procedures, would not result in a severe punishment. It would only be a three-day suspension per the punishment grid, and Kessler made it a point not to lie to the kids. Kessler testified that, in her professional opinion, a three-day suspension was insufficient. (Kessler Dep., RE 92-21, Page ID ##3923-3924)

In addition to her suspension and the intimidation from the police at the school, S.C. and her mother were told by Kessler essentially that the sexual incident with the circulating sexual recording would blow over in a day or so. (Kessler Dep., RE 92-21, Page ID #3918); (S.C. Aff. RE 92-11, Page ID #3424), (T.C. Aff. RE 92-12, Page ID #3429.) Contrary to the assertion that the incident would blow over, S.C. and her family were threatened with physical injury, including being shot, for reporting the behavior to the school, which they reported directly to principal Kessler and Det. Carrigan (S.C. Aff. RE 92-11, Page ID #3424), (T.C. Aff. RE 92-12, Page ID #3429); (Carrigan Dep. RE. 92-15, Page ID ##3823-3824, 3826-3827.) The school never gave any assurance to S.C. that they were going to take any measures at all to protect her from the threats, or from further incidents of unwanted sexual activity at school, unwelcome sexual recordings taken at school, or the unwelcome circulation of sexual recordings. Neither S.C. nor her family were told

about Title IX, informed of the Title IX coordinator, or advised that they could appeal or file a grievance of the decision to summarily dismiss her complaints by the principal following the report of the incident and subsequent threats. S.C. was constructively expelled or forced to leave Hunters Lane High School.  T.C., the mother of S.C., based upon the failure of the school system to provide any relief or reassurance of safety for her child, saw no option other than withdrawing her child from the school and put her in homebound classes. The school was fully aware that this occurred due to the lack of protection and never made any attempt to discourage T.C. from doing so.  Detective Carrigan understood T.C. 's concerns and agreed in T.C.'s decision to remove S.C. from the environment at Hunters Lane, stating that he did not blame her.  (Carrigan Dep. RE. 92-15, Page ID ##3811-3812.) As a result of the Title IX violations and threats to which S.C. was subjected, coupled with the failure of MNPS to take any appropriate corrective action, T.C. sold their home at a loss and moved to a different county to protect their daughter and get out of MNPS. (T.C. Aff. RE 92-12, Page ID #3429.)

The facts supporting summary judgment were introduced into the lower court at trial, as deposition testimony and trial exhibits and are included in the record for this appeal.  (See Trial Transcript Vol. I, at Page ID ##4480-4485)(Stipulation #4 depositions introduced RE 157, Page ID#4450.)

## C.

## FACTS SUPPORTING S.C.'S AWARDED DAMAGES

The damages awarded were supported by expert medical proof, by MNPS's retained expert, along with S.C.'s expert, regarding emotional damages. MNPS never argued that emotional damages were not recoverable before the Trial Court. S.C.'s expert was Dr. Ihrig while MNPS's expert was Dr. Vinson and the Trial Court found Dr. Ihrig to be more credible than Dr. Vinson. (Findings of Fact & Concl. of Law, RE 182, Page ID #5179). Dr. Ihrig testified that S.C. suffered from PTSD and had received substantial counseling and medication for this. She had also gained 60 pounds, had mutilated herself by cutting and had thoughts of suicidal ideation. (Testimony of Dr. Ihrig Trial Tr. Vol. I RE # 166, Page ID ##4662, 4665-4666, 4671-4672). The Trial Court also awarded damages for lost educational opportunities within the $75,000 award. (Findings of Fact & Concl. of Law, RE 182, Page ID #5197). As to the educational opportunity being lost S.C was first suspended for three days, then her mother put S.C. in the Oasis Center to protect her from the ongoing threats. S.C was then put in the homebound program and eventually moved to another school district to protect her.  (Testimony of T.C. Trial Tr. Vol. I RE # 166, Page ID ##4538-4540, 4547). Dr. Ihrig testified S.C. went from a 3.4 GPA to barely graduating high school, having to attend an adult program to do so. (Testimony of Dr. Ihrig Trial Tr. Vol. I, RE # 166, Page ID ##4679.)

## SUMMARY OF THE ARGUMENT

The trial in this case only consisted of a single issue remaining after the Trial Court's reconsideration of its prior summary judgment ruling based on its interpretation of *Kollaritsch* without the benefit of the holding in *Doe ex. rel. Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty.*. The S.C. case was tried on a theory of deliberate indifference of MNPS following ongoing threats of MNPS students towards S.C. and her family after she reported and was cooperating with the investigation into the sexual assault, unauthorized recording and the release of the unauthorized recording, all occurring within a MNPS school. These threats drove S.C. from her school interfering with her educational opportunity. The Trial Court's factual findings, legal conclusions, and award of $75,000.00 should be affirmed for this particular claim.

S.C. argues in her cross-appeal that *Kollaritsch* only applies to "after" cases involving college students and, therefore, has no applicability to the S.C. case and the portions of her case that were dismissed on summary judgment, should be . remanded for reconsideration. The identical issues were resolved in the case of *Doe ex. rel. Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty.*, 35 F.4th 459 (6th Cir. 2022) which involved two cases that were consolidated with S.C. at the trial level but dismissed after *Kollaritsch* in their entirety at summary judgment, while

33

S.C. was allowed to move forward on her remaining single theory. No reasonable argument can be made that the dismissed portions of S.C. lawsuit should not be similarly vacated and remanded.

## STANDARD OF REVIEW

S.C. would agree with MNPS that on the issues MNPS appealed from a bench trial the district court's factual findings are reviewed for clear error and legal conclusions *de novo*. *Chesnut v. United States*, 15 F.4th 436, 441 (6th Cir. 2021).

The standard of review on the cross-appeal of S.C. is an appeal from summary judgment. This Court reviews *de novo* a district court's grant of summary judgment "'view[ing] the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party.'" *Fed. Home Loan Mortg. Corp.* v. *Lamar*, 503 F.3d 504, 507-508 (6th Cir. 2007) (citations omitted).

34

# ARGUMENT

## A. RESPONSE TO APPEAL OF MNPS

### 1. THE TRIAL COURT CORRECTLY FOUND MNPS LIABLE UNDER TITLE IX WHEN MNPS WAS DELIBERATELY INDIFFERENT TO DANGEROUS ONGOING THREATS TOWARD S.C. AND HER FAMILY, BECAUSE S.C. WAS COOPERATING IN A SEXUAL ASSAULT/SEXUAL HARSMENT INVESTIGATION AT HER SCHOOL, WHICH DROVE S.C. FROM HER SCHOOL.

MNPS misstates the issues that were before the Trial Court. MNPS on pages 16-29 of their First Brief analyze the sexual assault, the recording of the sexual assault, and the release of the recording. These were not the issues upon which the Trial Court found MNPS liable. These 3 issues of Title IX violations and sexual harassment were dismissed by the trial court in an extensive summary judgment memorandum opinion, which forms the basis of the cross-appeal herein. There was only one remaining issue that the court considered at trial. This was clear in the court's trial opinion as stated below:

> The court's prior reasoning regarding S.C.'s "after" claim, therefore, remains largely intact. It may be that *Kollaritsch* limits the evidence on which S.C. can rely to establish her Title IX injuries, because she now must focus on the actual post-incident harassment that she endured rather than broader aspects of the school's alleged mishandling of her case. However, a female student's being hounded out of school by threats and harassment related to her participation in a school's investigation into an on-campus sexual event is well within the core Title IX issues that survive *Kollaritsch*. (Findings of Fact & Concl. of Law, RE 182, Page ID #5182).

The above quote is from the trial court's post-trial Findings of Fact & Concl. of Law but it is the same as her opinion in the reconsidered summary judgment. (Memorandum on the reconsidered summary judgment, RE 124, Page ID #4371). For MNPS to argue that this was not the issue to be tried is disingenuous at best. MNPS was aware the trial court had dismissed S.C. 's and all the consolidated plaintiffs "before claims". (Memorandum on the reconsidered summary judgment, RE 124, Page ID 4365). The Trial Court also dismissed the §1983 "before claims" for all plaintiffs. (Memorandum on the reconsidered summary judgment, RE 124, Page ID #4374). As set out above the only "after claim" of S.C. that survived the reconsidered summary judgment was the threats after MNPS knew of after the sexual conduct, the sexual video and the distribution of the sexual video.

MNPS even argues that the trial court, in her opinion, mistakenly analyzed the threats against S.C., as if S.C.'s Title IX claim was predicated on this theory. (First Brief of MNPS Case 22-5104: Document 30 Page 32). S.C.'s Title IX case was, of course, predicated on this one remaining theory and the trial court's analysis was correct. The reason MNPS does not want to discuss the ongoing threats that S.C. was subjected to, and which drove her from Hunters Lane High School, is because MNPS did nothing about them. It was this failure to do anything to try and stop the threats that constituted the deliberate indifference and subsequent damage as found by the trial court.

There is, however, an obligation not to be deliberately indifferent to a known risk of sexual harassment. Hunters Lane administrators, in their handling of S.C.'s predicament, addressed some aspects of the situation in ways that likely fell within the scope of their broad discretion. However, they improperly confined their focus to the initial sexual encounter and the video itself, at the expense of protecting S.C. from the onslaught of harassment that followed. Without that protection, S.C. was denied her statutory right to an equal education regardless of sex. S.C., accordingly, has established the final two necessary elements for her Title IX claim—deliberate indifference and causation of subsequent instances of sexual harassment—and is entitled to a verdict in her favor on that claim. (Findings of Fact & Concl. of Law, RE 182, Page ID ##5190-5191).

MNPS' claim that the Plaintiff waived the issue regarding the harassment that drove S.C. from school makes no sense, when the Trial Court ruled post-Kollaritsch in response to the reconsideration of summary judgment, that the only issue remaining was the issue regarding this harassment.  That is indeed what the entire trial was about.

In addition, the Pretrial Order under the section of "Plaintiff's Theory", cited for this alleged forfeiture, clearly discussed the harassment and threats as follows:

"Further, after being advised of the subsequent actionable harassment and ongoing threats to Plaintiff and her family because of cooperating and reporting the events to the police investigator and school personnel, Defendant failed to intervene and/or protect Plaintiff or assure her ability to safely pursue her education. The severe and ongoing resultant damages led to the deprivation of Plaintiff's rights to a non-disrupted education and her rights to equal protection and has caused emotional injuries that have plagued Plaintiff's young life." (Pre-Trial Order Plaintiffs Theory, RE 161, Page ID #4466.)

Not only is the issue specifically set out in the Trial Courts summary judgment memorandum as the remaining issue to be tried, it is clearly set out in the

pretrial order and forfeiture is not available as a defense under these facts. The issue was further, fairly tried without objection and no motion or objection was made either pre-trial, during trial or post-trial by MNPS regarding this issue. Reported Sixth Circuit law establishes that issues properly tried are not controlled by a waiver after a full and fair trial.

> "One of the purposes which the pretrial conference serves is to expedite disposition of cases by simplifying the issues and eliminating surprise. Rule 16 of the Federal Rules of Civil Procedure provides that the pretrial order 'when entered controls the subsequent course of the action, unless modified at the trial to prevent manifest injustice. Rule 15(b) of Fed.R.Civ.P. provides: When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Where an issue, not included in the pretrial order, is actually tried by the parties, the aforementioned policies served by Rule 16 would not be served by the trial Court's refusal to consider the issue. Rule 16 should be read in the light of Rule 15(b). *Wallin v. Fuller*, 476 F.2d 1204, 1209-1210 (5th Cir. 1973); *Bucky v. Sebo*, 208 F.2d 304, 305 (2d Cir. 1953). See *Mayfield v. First Nat'l. Bank*, 137 F.2d 1013, 1016 (6th Cir. 1943)."

*Mains v. United States,* 508 F.2d 1251, 1259 (6th Cir. 1975).

MNPS, when discussing the threats, argue first that the threats were not based on her sex. (First Brief of MNPS (Case 22-5104: Document 30 Page 33-34). The Trial Court addressed this issue and found otherwise, holding the threats were to discourage S.C. from seeking the school's assistance in combating gender related harassment. (Findings of Fact & Concl. of Law, RE 182, Page ID ##5185-5187).

MNPS next argues that the threats were not during school hours or on school grounds. (First Brief of MNPS (Case 22-5104: Document 30 Page 33-34).

However, there were threats from other students that occurred while S.C. and her mother were meeting with Detective Carrigan at school and then, Principal Kessler, the executive principal, during school hours and the school did nothing about them. (Findings of Fact & Concl. of Law, RE 182, Page ID ##5188-5190). The Trial Court specifically believed S.C. relayed these threats to Dr. Kessler despite her denial. The communication of the threats to Dr. Kessler occurred right after they were shared with Detective Carrigan. The threats were ongoing during school hours and S.C.'s sister was in the car on school grounds, relaying the ongoing threats while S.C. met with Dr. Kessler. (Findings of Fact & Concl. of Law, RE 182, Page ID ##5163, 5167-5170). Dr. Kessler refused to even review them.

MNPS last argues that it was reasonable to simply defer to the police as to the ongoing threats that drove S.C. from school. (First Brief of MNPS (Case 22-5104: Document 30 Page 35-36). The principal did not say she deferred to the police and believed the police would stop the threats. The principal, as set out above, denied she was told of the threats. MNPS cannot now argue that Dr. Kessler told the police the threats she denied knowing about, with a belief that the police would stop the threats. Dr. Kessler did nothing to try and stop the threats from the other students at S.C.'s school, of which the Court found Kessler was aware, and resulted in S.C. being forced to leave her school. The Trial Court citing *Foster v. Bd. of Regents of Univ. of Michigan*, 982 F.3d 960, 965 (6th Cir. 2020),  held that

39

doing almost nothing to known harassment amounts to deliberate indifference.

(Findings of Fact & Concl. of Law, RE 182, Page ID #5188).

The Trial Court was therefore correct in finding MNPS deliberately

indifferent to the ongoing threats about which S.C. complained to her principal.

### 2. MNPS BY FORFEITURE CANNOT RAISE THE ISSUE OF EMOTIONAL DAMAGES BEING PROHIBITED IN A TITLE IX CASE BECAUSE MNPS FAILED TO RAISE THE ISSUE BEFORE THE TRIAL COURT.

MNPS has for the first time on appeal raised its objection to S.C. receiving

damages for emotional injuries for her Title IX claim. This issue was not raised in

any prior pleading pre-trial, during trial, or post-trial by MNPS. Instead, MNPS

hired an expert to testify about the extent of the emotional injuries that S.C.

suffered. MNPS, on appeal, for the first-time claims that it was error for the Trial

Court to award damages for emotional injuries in a Title IX case. This issue has

been forfeited under Sixth Circuit law.

> Before a party may present an issue for our review, we customarily require the party to raise the issue in the district court. *Greer v. United States*, 938 F.3d 766, 770 (6th Cir. 2019). (We use the word "issue" here to refer to what might also be deemed a "claim" or an "argument." The distinction may matter in some cases, but it does not matter here.) Otherwise, omission of an issue in the district court typically will amount to a forfeiture of the issue, meaning we will not consider it on appeal.

*Sheet Metal Workers' Health & Welfare Fund of N. Carolina v. L. Off. of Michael A. DeMayo, LLP*, 21 F.4th 350, 355 (6th Cir. 2021)

The identical reasoning applied by the 9th Circuit Court of Appeals in a comparable Title IX post-*Cummings* case, *Cummings v. Premier Rehab Keller, P.L.L.C.* 142 S. Ct. 1562 (2022), should also be followed in the Sixth Circuit. The 9th Circuit held that there was a forfeiture and refused to consider the appellant's argument that emotional distress damages are not available under Title IX, since it was raised for the first time on appeal.

> While an intervening change in the law is a recognized ground for excusing forfeiture of an issue, *see Carlson*, 900 F.2d at 1349, LAUSD "has not shown the law changed in such a manner that [it] could not have made [the new argument] earlier," *Robinson v. Kramer*, 588 F.3d 1212, 1217 (9th Cir. 2009).To start with, there was no binding Ninth Circuit precedent that foreclosed a challenge to noneconomic damages under Title IX during the trial or on appeal. Furthermore, the Supreme Court's general statement about the availability of damages under Title IX in *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 76 (1992), did not "describe the scope of 'appropriate relief'" under Title IX, *Barnes v. Gorman*, 536 U.S. 181, 185 (2002), much less establish that noneconomic damages are available, *Cummings*, 142 S. Ct. at 1570. On the contrary, the Supreme Court's conclusion in *Barnes* that a Spending Clause funding recipient is only subject to "those remedies traditionally available in suits for breach of contract," 536 U.S. at 187, signaled the viability of arguments against noneconomic damages under Spending Clause legislation. The defendants in *Cummings v. Premier Rehab Keller, P.L.L.C.*, took note of this and ultimately prevailed. 948 F.3d 673, 678 (5th Cir. 2020), *aff'd*, 142 S. Ct. at 1576. By the time the Fifth Circuit decided *Cummings*, LAUSD should have known that the argument against noneconomic damages under Title IX was viable. By not raising the argument sooner even though it could have, LAUSD forfeited it."

*Asfall v. Los Angeles Unified Sch. Dist.*, No. 20-55599, 2022 WL 2764747, at *4 (9th Cir. July 15, 2022).

MNPS cites to Sixth Circuit cases that are not on point, in an effort to argue that the forfeiture does not apply to it. MNPS argues in its First Brief, that the Sixth Circuit, in an unpublished opinion, held that emotional injuries were appropriate in a Title IX action, and, therefore, MNPS was not required to argue the issues at the trial court level since *Varlesi* provided controlling authority. However, the cited case, *Varlesi v. Wayne State Univ.*, 643 Fed. Appx. 507 (6th Cir. 2016) does not even deal with the issue of whether emotional injuries were recoverable at all in a Title IX case, cited at MNPS First Brief, DE 30, Page 37 fn.10. *Varlesi* only addressed evidentiary issues and whether a remittitur was appropriate, with recoverability of emotional injury damages in a Title IX case was not considered by the *Varlesi* Court at all.

MNPS, further, in its First Brief, fn. 11, page 37, cites a Sixth Circuit case that, again, is not on point.  In the case of *ACT, Inc. v. Worldwide Interactive Network, INC, 46* F. 4th 489, 508 (6th Cir. 2022), the trial court, while still having jurisdiction, allowed the parties to address non-final orders when there was a change in controlling authority.

The Appellant's Brief, fn.11, also cites *GenCorp, Inc., v. Olin Corp.*, 477 F.3d 368,374 (6th Cir. 2007), which rejects MNPS' argument and is consistent with the Ninth Circuit opinion which requires a litigant, unless there is controlling precedent in the circuit, to raise issues that could have been foreseen by a litigant.

> Accordingly, when GenCorp took its first appeal, there was no controlling authority in the Sixth Circuit on the issue—just a handful of cases from other jurisdictions pointing in different directions. When the Supreme Court issued its decision in *Cooper Industries,* it thus did not alter controlling authority in this circuit. This is not a case, in short, in which the appellant chose not to challenge a controlling proposition of Sixth Circuit law—only to learn after the appeal that the Supreme Court had chosen to reverse that controlling authority.

*GenCorp, Inc. v. Olin Corp.*, 477 F.3d 368, 374 (6th Cir. 2007)

MNPS' reliance on an unpublished Sixth Circuit case that is neither on point nor controlling authority, cannot excuse its failure to raise the issue of the recoverability of emotional injuries before the Trial Court. Forfeiture of this argument is appropriate.

Additionally, *Cummings v. Premier Rehab Keller, P.L.L.C.* held that "emotional distress damages are not recoverable under the Spending Clause antidiscrimination statutes," 142 S. Ct. 1562, 1576 (2022) (addressing Rehabilitation Act and Affordable Care Act). The issue of *Cummings* application to Title IX cases is unsettled and has been held, pretrial in District Court, not to apply to Title IX cases, as set out below:

> Defendants move to preclude evidence or argument regarding Plaintiffs' emotional distress or harm, arguing that the United State Supreme Court's recent ruling in *Cummings v. Premier Rehab Keller, P.L.L.C.*, No. 20-291, 596 U.S. ——, 142 S. Ct. 1562, 212 L.Ed.2d 552 (April 28, 2022), precludes recovery of emotional distress damages under Title IX. Plaintiffs argue that *Cummings* applies only to Rehabilitation Act and Patient Protection and Affordable Care Act claims. *Cummings*, 142 S. Ct. at 1576. Because *Cummings* was not a Title IX action, it does not make evidence of emotional distress or

harm inadmissible in this case. *Id.* Therefore, evidence of such damages will not be precluded.

*Doe v. Purdue Univ., No. 18-CV-89-JEM, 2022 WL 2828238, at \*4 (N.D. Ind. July 20, 2022).*

Plaintiff had no opportunity to argue the issues in the trial court demonstrating that MNPS did in fact, have responsibility for emotional distress damages available to S.C. under Title IX. With their failure to raise the issue until appeal, the issue should not be considered by this Court.

## A. CROSS-APPEAL OF S.C.

**WHETHER THE ISSUES THE TRIAL COURT DECIDED AGAINST PLAINTIFF IN HER RULING ON RECONSIDERATION OF SUMMARY JUDGMENT SHOULD BE VACATED AND REMANDED FOR CONSIDERATION BASED UPON *6TH CIR. HOLDING IN* DOE EX. REL. DOE #2**

### 1. THE PORTION OF S.C.'s BEFORE CLAIM DISMISSED ON SUMMARY JUDGMENT SHOULD BE VACATED AND REMANDED

The Trial Court first considered MNPS summary judgment motion on S.C.'s case, along with 3 other cases which had been consolidated with S.C. in 2019 and denied MNPS' motion for summary judgment as to S.C. on all issues raised. (Memorandum, RE 101, Page I.D. #4163). An interlocutory appeal followed and, upon remand in 2020, the Trial Court reconsidered her ruling solely based upon misinterpretation of the *Kollaritsch* decision. (Memorandum, RE 124, Page ID ##4334-4335, 4359), the trial court dismissed both the "before claims" and the a portion of the "after claims" of S.C. regarding the assault, the recording of it, the releasing of the recording, and the initial investigation of the sexual assault, as well as the "before claim" associated with the §1983 action. The trial court memorandum noted, when discussing the §1983 claim, that different policies may have prevented the sexual assault from occurring at all ("before claim"), but that *Kollaritsch* eliminated that theory from being available in the Sixth Circuit.

45

(Memorandum on reconsidered summary judgment, RE 124, Page ID ##4365, 4371, and 4373-4374. See also the memorandum opinion after trial (Findings of Fact & Concl. of Law, RE 182, Page ID ##5178, 5180, and 5193).

The *Doe ex. rel. Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty.*, decision in the Sixth Circuit, clarified the issue with the Sixth Circuit recognizing and allowing "before claims". The S.C. case, like the two consolidated cases, should be vacated and remanded for further consideration on the dismissed "before claims" of both Title IX and §1983. *Doe ex. rel. Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty.*, 35 F.4th 459, 468 (6th Cir. 2022).

## 2. THE PORTION OF S.C.'s AFTER CLAIM DISMISSED ON SUMMARY JUDGMENT SHOULD BE VACATED AND REMANDED

The Trial Court, based solely on *Kollaritsch,* dismissed any "after claim" other than the ongoing threats claims*,* holding that, "'Before' claims, moreover, are not the only plausible theories of liability that *Kollaritsch* foreclosed. The court considered and rejected the possibility that a plaintiff might have a Title IX claim based on the fact that a school's handling of the investigation of her harassment was itself traumatic or inappropriate but did not cause any future instances of additional harassment. See *Kollaritsch*, 944 F.3d at 618." (Findings of Fact & Concl. of Law, RE 182, Page ID #5179).

This finding is now erroneous and should be vacated and remanded. *Kollaritsch,* which involved college students, has been held by the Sixth Circuit not

to apply in high schools, resulting from the appeal from S.C.'s consolidated cases in

*Doe ex. rel. Doe #2*. The Trial Court should, on remand, decide if S.C. has triable

issues on her "after claims" that were dismissed on summary judgment

reconsideration post *Kollaritsch*.

> *Kollaritsch* is limited to Title IX "after" claims, does not apply to "before" claims, and does not apply to students in high school. Therefore, we reverse the district court's dismissal of Sally Doe's "after" claim. We vacate the district court's dismissal of the students' Title IX "before" claims, § 1983 claims, and Jane Doe's "after" claim. We remand to the district court for a determination of whether the students have presented sufficient evidence to survive summary judgment on these claims.

*Doe ex. rel. Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty.*, 35 F.4th 459, 468 (6th Cir. 2022).

## 3.  THE TRIAL COURT IMPROPERLY DISMISSED S.C.'S §1983 BEFORE CLAIM

The Trial Court granted summary judgment to MNPS with respect to the

§1983 before claims of S.C. and the consolidated Plaintiffs in her September 2020

Memorandum, holding that Title IX and §1983 school harassment claims rise and

fall together on most substantive issues. She held that, since "before claims" are not

available in the Sixth Circuit under Title IX, they are not available under §1983,

resulting from her misinterpretation of the applicability of *Kollaritsch*.

(Memorandum on reconsidered summary judgment, RE 124, Page ID ## 4373-

4374).

The Sixth Circuit Court of Appeals has already rendered its opinion on the exact issue that is the subject of this counter-appeal, vacating and remanding the dismissed §1983 claims in those cases that had been consolidated with S.C.'s case, prior to her case being separated for trial. Because S.C.'s case was not a final judgment when the Jane Doe and Sally Doe cases were appealed, she was not included in that appeal from the ruling granting summary judgment for MNPS against John and Sally Doe from the consolidated cases. In this cross-appeal, S.C. relies upon the same facts and identical legal arguments to reach the same result, requiring vacating the summary judgment ruling and remanding the case on the §1983 "before claim".

The Sixth Circuit Court ruled on that grant of summary judgment to the §1983 claims as follows:

> Jane Doe and Sally Doe also brought claims under §1983. "To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Doe v. Miami Univ.*, 882 F.3d 579, 595 (6th Cir. 2018) (citation omitted). Jane Doe and Sally Doe allege MNPS violated the Equal Protection Clause of the Fourteenth Amendment. The district court determined the §1983 claims rose and fell with the Title IX claims and dismissed all the claims together. As we vacate in part and reverse in part the district court's dismissal of the students' Title IX claims, we also vacate its dismissal of the §1983 claims.

*Doe ex. rel. Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty.,*35 F.4th 459, 468 (6th Cir. 2022).

## CONCLUSION

For the reasons set forth herein the appeal of appellant should be denied, the

$75,000.00 verdict upheld, the cross-appeal of S.C., vacating and remanding the

summary judgment ruling, which dismissed the Title IX and 42 U.S.C. § 1983

"before claims", the Title IX "after claim" for the manner of the investigation and

the suspension of S.C., should be granted.

Respectfully Submitted,

s/ Stephen Crofford
Stephen Crofford #12039
Mary Parker #6016
**PARKER & CROFFORD**
5115 Maryland Way
Brentwood, TN 37027
Tel.: 615-244-2445
Fax: 615-255-6037
stephencrofford@msn.commparker@parker-crofford.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

I certify that the foregoing document complies with the word limit of Fed. R. App. P 32(a)(7)(B), excluding the parts of the document exempted by Fed. R. App. P. 32(f) and it contains 12018 words. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it was prepared using Times New Roman 14-point type in Microsoft Word for Office 365.

/s/Stephen Crofford
Attorney for Appellee/Cross-Appellant
Dated: December 5, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of December, 2022, a true and correct copy of the foregoing was served via the court's electronic filing system to J. Brooks Fox, Metropolitan Courthouse, Suite 108 P.O. Box 196300 Nashville, TN 37219.

s/ Stephen Crofford
Stephen Crofford

# ADDENDUM

## DESIGNATION OF CITED DISTRICT COURT DOCUMENTS WITHIN 2nd BRIEF FILED DECEMBER 5, 2022

## (WITHIN THE ELECTRONIC RECORD)

| RE No. | TITLE | Page ID # Range |
|--------|-------|-----------------|
| 1-5 | Part of S.J. Dear College letter dated April 24, 2015 | 94-97 |
| 70-14 | Part of S.J. Email between Sally Doe and Newman | 630-631 |
| 70-17 | Part of S.J. Bullying and Harassment Reporting Form | 672-673 |
| 74-71 | Part of S.J. Written Statement from S.C. | 1184-1184 |
| 77-1 | Part of S.J. Marvin Olige Deposition | 1659-1767 |
| 83-5 | Part of S.J. Deposition of SRO Boone | 2575-2661 |
| 87-11 | Part of S.J. Keely Mason Deposition | 3159-3182 |
| 87-15 | Part of S.J. Defendants Interrogatory Responses | 3217-3234 |
| 92 | Consolidated Summary Judgment Opposition | 3313-3347 |
| 92-6 | Part of S.J. Affidavit of Sally Doe # 2 | 3399-3402 |
| 92-7 | Part of S.J. Affidavit of Jane Doe | 3403-3407 |
| 92-11 | Part of S.J. Affidavit of S.C. | 3424-3428 |
| 92-11 | Part of S.J. Affidavit of T.C. | 3429-3434 |
| 92-13 | Part of S.J. Continuing Exhibits | 3435-3514 |
| 92-15 | Part of S.J. Deposition Detective Carrigan | 3796-3827 |

| | | |
|---|---|---|
| 92-18 | Part of S.J. Deposition of Phyllis Dyer | 3833-3877 |
| 92-21 | Part of S.J. Deposition Susan Kessler | 3906-3926 |
| 92-25 | Part of S.J. Deposition Julie McCargar | 3957-3992 |
| 92-31 | Part of S.J. Deposition of S.C. | 4039-4051 |
| 95 | Part of S.J. Affidavit of Jane Doe #2 | 4076-4080 |
| 101 | First Memorandum Summary Judgement | 4106-4163 |
| 102 | First Order on Summary Judgement | 4164-4166 |
| 124 | Second Memorandum Summary Judgement | 4333-4375 |
| 125 | Second Order on Summary Judgement | 4376-4378 |
| 161 | Joint Pretrial Order | 4464-4470 |
| 166 | Transcript of Proceedings held on July 20, 2021 | 4477-4737 |
| 167 | Transcript of Proceedings held on July 21, 2021 | 4738-4944 |
| 182 | Findings of Fact and Conclusions of Law | 5134-5198 |
| 183 | Order | 5199-5199 |
| 184 | Entry of Judgment | 5200-5200 |
| 187 | Notice of Appeal | 5205-5206 |
| 197 | Notice of Cross-Appeal | 5371-5372 |